# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **COURTNEY L. MERRIWEATHER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **CASE NO. 2:13-cv-456-WKW-** |
| | ) **PWG** |
| | ) |
| **CHARTER COMMUNICATIONS, LLC;** | ) |
| **CHARTER COMMUNICATIONS** | ) |
| **HOLDING COMPANY, LLC; and** | ) |
| **CHARTER COMMUNICATIONS, INC.,** | ) |
| | ) |
| **Defendants.** | ) |

## REPORT AND RECOMMENDATION[1]

This is an employment discrimination case.  Plaintiff, Mr. Courtney L. Merriweather ("Mr. Merriweather" or "Plaintiff"), is an individual of African American heritage who worked as a disconnect technician and a service technician for Defendants Charter Communications, LLC, Charter Communications Holding Company, LLC, and Charter Communications, Inc. (collectively, "Charter" or "Defendants") from August 9, 2001 until he resigned on or about August 29, 2011. (Doc. 1 at ¶ 15; Doc. 25-1 at pp. 21-22).  He asserts that Defendants discriminated

---

[1] On October 28, 2014, William Keith Watkins, United States District Judge for the Middle District of Alabama, referred the above-styled case to the undersigned Magistrate Judge for disposition or recommendation.  (Doc. 41).

1

against him on the basis of his race, African American, in the constructive discharge termination of his employment, failure to promote him to a position for which he was qualified, assignment of job duties, segregation of its workforce by race, and in the creation of a hostile work environment.  (Doc. 1).  Plaintiff brings his claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., and the Civil Rights Act of 1866, 42 U.S.C. § 1981, through the remedial vehicle of 42 U.S.C. § 1983.

This matter is before the court on Defendants' motion for summary judgment as to all of Plaintiff's claims.  (Doc. 24).  The parties have briefed the motion and filed evidentiary submissions.  This matter is deemed under submission and is ripe for review.  Upon consideration of the pleadings, the parties' briefs, and the evidence of record and for the reasons stated herein, the Magistrate Judge **RECOMMENDS** that Defendants' motion for summary judgment is due to be **GRANTED**.

## I.      JURISDICTION AND VENUE

The court has subject matter jurisdiction over the claims in this case pursuant to 28 U.S.C. § 1331 (federal question), § 1343 (equal rights), and 42 U.S.C. § 2000e-5(f)(3).  The parties do not contest personal jurisdiction or venue, and there are adequate allegations to support both.

## II.   BACKGROUND AND MATERIAL FACTS[2]

On August 9, 2001, Charter hired Mr. Merriweather to an entry level position as an "Installer I" in Montgomery, Alabama.  (Doc. 25-28 at p. 2).  Mr. Merriweather was promoted twice: to "Service Technician" on August 22, 2002, and to "Broadband Technician II" ("BBT" or "BBT II") on August 1, 2004.  (Doc. 29-5 & Doc. 29-29).  His job duties at those positions were "to perform basic to advanced [cable] installations, disconnects and service changes for residential and commercial customer services; [and to] perform basic to advanced troubleshooting and repair ...."  (Doc. 25-5 at p. 2).

During his employment with Charter, Mr. Merriweather unsuccessfully applied for different job assignments on four occasions.  Mr. Merriweather testified that he understood that a change to any other job within Charter constituted a promotion.  (Doc. 32-1 at p. 9).  His plan was to work for Charter "in the long run," and he "wanted to learn every position [he] could to move up."  (Doc. 32-1 at pp. 9, 11).  He

_____

[2] These are the facts for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.") (citation and marks omitted).  In this case, material facts are in dispute.  The facts discussed herein that are based on disputed evidence are construed in a light most favorable to Mr. Merriweather, the non-movant, and all reasonable inferences have been drawn from the evidence in his favor.  That construction and deference ends where there is no evidence to support an allegation of fact.  No findings of fact or credibility determinations are made from the evidence.

did not consider whether the pay was less than what he made as a BBT II because he wanted to have a wide range of experiences in different positions at Charter, which he thought would increase his chances of advancement.  (Doc. 32-1 at p. 16).  The jobs he applied for were "WIP Clerk," "Customer Sales & Service Center Representative," "Quality Assurance Technician," and "CLI Technician."[3]  (Doc. 29-1).

In January 2011, Mr. Merriweather applied and interviewed for the job of CLI Technician.  (Doc. 25-20 at p. 2).  Mr. Merriweather, in his brief in opposition to summary judgment, argues that employment as a CLI Technician would have been

---

[3] Mr. Merriweather, in his brief in opposition to Defendants' motion for summary judgment, makes the following representation: "Plaintiff did not raise a claim concerning the denial of the WIP Clerk, CSSC Representative, and QA Technician positions as stand alone claims.  Rather, Plaintiff raises a complaint concerning the CLI position and discusses those prior actions of discrimination to provide evidence of [Defendants'] continued practice of discrimination ... the denial of those additional position [are addressed] only to highlight additional evidence to prove the circumstances of [Defendants'] pattern of discrimination and pretextual reasoning ...."  (Doc. 33 at p. 23).  Accordingly, the only discriminatory promotion claim at issue in this case is associated with the CLI Technician position.

Mr. Merriweather does not support his conclusion that the three previous denials of transfer or promotion were motivated by race, and there is no evidence of record tending to support that inference.  Mr. Merriweather testified that race "was not an issue" in his unsuccessful application to be a WIP Clerk.  (Doc. 32-1 at p. 10).  He further testified that he never told anyone that the CSSC Representative position was awarded to another candidate because of race.  (Doc. 32-1 at pp. 12, 15).  Mr. Merriweather's complaints or lack thereof notwithstanding, the WIP Clerk and CSSC Representative positions were awarded to black applicants.  (Doc. 25-6 at p. 2; Doc. 25-11; Doc. 25-12).  A white applicant accepted the position of QA Technician; however, the position required "BBT III Certification," which Mr. Merriweather did not possess.  (Doc. 25-15 at p. 3).  The successful applicant was BBT III certified and he was previously employed by Charter as a QA Technician.  (Doc. 25-17 at pp. 2-3).  On the evidence, there is no "pattern or practice" of discrimination revealed by Mr. Merriweather's unsuccessful applications to be a WIP Clerk, CSSC Representative, or QA Technician.

a promotion for him, but Charter contends that it was not. Merriweather was one of four candidates interviewed for the job. (Doc. 25-20 at p. 2). Mr. Jason Hampton (white), a Charter employee who acted as the interviewer and hiring manager for the CLI Technician position, interviewed Mr. Merriweather by telephone. (Doc. 25-1 at pp. 16-17; Doc. 25-20). The interview was only conducted after Mr. Merriweather had several conversations with Ms. Sue Johnston in the human resources department over the course of several weeks.[4] (Doc. 25-1 at p. 16). According to Merriweather, Ms. Johnston intervened on his behalf with Mr. Hampton to precipitate the interview. (Doc. 25-1 at p. 16).

The telephone interview lasted less than two minutes and was conducted while Mr. Hampton ate his lunch. (Doc. 25-1 at pp. 17, 38). At the time of the interview, Mr. Merriweather had never met Mr. Hampton "face-to-face."[5] (Doc. 25-1 at p. 38).

---

[4] Ms. Johnston began working for Charter in 2005, and she holds the position of Senior Human Resources Generalist with her "home base" located in Newnan, Georgia. (Doc. 32-6 at pp. 3, 7). She has responsibilities for Charter human resources operations in locations throughout Alabama and Georgia. (Doc. 32-6 at p. 7). Montgomery, Alabama, is within Ms. Johnston's territory. (Doc. 32-6 at p. 7). She reports directly to Paige Wilder, Charter's Rule 30(b)(6) representative in this lawsuit. (Doc. 32-6 at p. 7). Mr. Merriweather testified that he complained to Ms. Johnston numerous times between 2008 until his resignation about race discrimination and possible retaliation at Charter. Ms. Johnston testified that no such complaints were ever made. That dispute of fact, except where otherwise discussed herein, is immaterial to the disposition of the claims in this lawsuit.

[5] Mr. Merriweather testified that he met and talked with a man named Jason after the interview, but he did not know if the person he met was Mr. Hampton. (Doc. 25-1 at p. 18). Assuming for purposes of the instant motion for summary judgment that the man was, in fact, Mr. Hampton, there is no evidence that the two men met in person before Mr. Merriweather's telephone

During the telephone interview, Mr. Hampton did not say anything Mr. Merriweather considered as being related to or negative about Merriweather's race.[6]

Mr. Hampton told Mr. Merriweather that a move to CLI Technician would be a "lateral move" from his BBT II position.  (Doc. 25-1 at p. 40).  According to his deposition testimony, Mr. Merriweather "was really interested in the CLI position because you're just driving all day ... and I was qualified."  (Doc. 25-1 at p. 40).  At the time of the interview, Mr. Merriweather was recovering at home from a job related shoulder injury. (Doc. 25-1 at p. 17).  Mr. Merriweather assured Mr. Hampton that the injury "wasn't going to be a problem ... [because] the doctor was about to release [him] and ... because [he] was opting out of surgery."  (Doc. 25-1 at p. 17). In addition to telling Mr. Hampton about his years of service and his qualifications for the job, Mr. Merriweather told Mr. Hampton that he would be a good candidate for the CLI Technician job because he would not "have to lift a ladder or anything or put strain ... on my shoulder."  (Doc. 25-1 at p. 17; *see also*, *e.g.*, Doc. 25-1 at p. 40).

A CLI Technician is considered by Charter to be an entry level job, and Mr. Hampton had the discretionary authority to decide who would fill the vacancy.  (Doc.

interview.

[6] Mr. Merriweather was asked by defense counsel at his deposition: "Did Jason Hampton ever say anything to you that led you to believe that he had anything against you as an African American?" (Doc. 25-1 at p. 38).  Mr. Merriweather answered, "No, but an interview shouldn't take less than two minutes and you shouldn't be eating lunch at the time ...."  (*Id.*).

32-2 at p. 36).  A CLI Technician would typically advance to a BBT position.  (Doc. 32-2 at p. 40).  In February 2011, at Mr. Hampton's recommendation, Charter hired Mr. Tom Mercer (white) to the CLI Technician position.  (Doc. 25-20; Doc. 25-21; Doc. 25-22).  Mr. Mercer was hired at a rate of $11.50 per hour, which is within the pay range of $10.95 - $16.45 per hour that Charter set for a CLI Technician.  (Doc. 25-21; Doc. 25-23).  As a BBT II, Mr. Merriweather was paid either $12.71 or $13.33 per hour when he sought employment as a CLI Technician.  (Doc. 25-1 at p. 12; Doc. 25-13 at p. 2).  The pay range for BBT II at that time was between $12.05 - $18.05 per hour.  (Doc. 25-10 at ¶ 5).  Had Mr. Merriweather been the successful CLI Technician candidate, and if Charter considered the change to that position from BBT II a lateral move, his pay rate would have remained the same.  (Doc. 32-2 at p. 40).  There is no evidence that Charter would have increased Mr. Merriweather's pay had he been hired as a CLI Technician.

Mr. Mercer, the successful candidate, was a former Charter employee when he was re-hired as a CLI Technician.  (Doc. 25-21).  Mr. Merriweather testified that Mr. Mercer is the brother-in-law of one of Mr. Hampton's "good friends," and that Mr. Hampton recommended that Charter re-hire Mr. Mercer because of that friendship.  (Doc. 25-1 at p. 15).

In this instance, the job description was not accurate and the minimum

qualifications standards for the CLI Technician position were not followed by Mr. Hampton. (Doc. 32-2 at p. 36). Mr. Mercer, the successful candidate, did not have the requisite Broadband certification or equivalent field experience. (Doc. 32-2 at p. 36). He also had a history of disciplinary infractions while employed by Charter, but Mr. Merriweather did not have any written discipline in his personnel record. (Doc. 32-2 at pp. 36-37). Mr. Merriweather was qualified for the job.

Mr. Merriweather complained to Ms. Johnston after he learned that he was not the successful applicant for the CLI Technician job, but he cannot recall if he told her that he thought he did not get the position because of his race. (Doc. 32-1 at p. 20).

Charter never offered Mr. Merriweather the position; however, Mr. Merriweather testified at his deposition that he would have been willing to work as a CLI Technician at a decrease in his pay rate to $11.50 per hour or for as low as $8.00 per hour because the job would look good on his resume. (Doc. 25-1 at pp. 13-14; Doc. 32-1 at p. 18). No one at Charter told Mr. Merriweather that the CLI Technician position was a gateway for further promotion or a "way to move up in the company." (Doc. 25-1 at pp. 13-14). Charter eliminated the CLI Technician position in 2013.

Mr. Merriweather alleges in his Complaint that Charter created and maintained racially segregated work teams or crews. (Doc. 1). The evidence does not support

that allegation.  According to Mr. Merriweather's deposition testimony, Charter employees at the BBT level in Montgomery, Alabama, did not work in crews but were assigned to individual tasks.  (Doc. 32-1 at p. 26).  BBT's worked alone, but they are organized under one of three supervisors.  Each supervisor is responsible for a "team" of BBT's.  Mr. Merriweather testified that Charter did not permit BBT's to work together or in groups and, when Merriweather and other employees informally agreed to work in groups to speed up their work, Charter directed that the practice was to stop.[7]  (Doc. 32-1 at p. 26).  There is no evidence of record that Charter organized or permitted black or white employees work in segregated "crews" or groups.

During Mr. Merriweather's employment with Charter in Montgomery, the three supervisors of BBT's in Montgomery divided the city into "areas" designated as

_____

[7] There is evidence is in the form of an affidavit from a former Charter employee, Mr. Romon Poole, that Mr. Merriweather relies upon to support his assertion that white BBT's were permitted to work in groups but that Charter would not permit black BBT's to do so.  His reliance on that evidence for that purpose is misplaced.  Charter employed Mr. Poole (black) as a BBT in Montgomery from September 15, 2007 until September 15, 2010.  (Doc. 32-17 at ¶ 2).  Mr. Poole testified that, "If white workers were in a jam on a job and got behind, they were allowed to get help from other white workers but blacks were not allowed to do the same."  (Doc. 32-17 at ¶ 11).  Mr. Poole does not state, however, when this practice took place and whether it is ongoing.  Charter offers evidence and Mr. Merriweather testified that black and white employees, on their own initiative and volition, agreed to work in pairs and groups to speed up their work.  Once Charter learned about the practice, Charter put a stop to it.  Mr. Poole's affidavit testimony is consistent with the other evidence of record on this issue.

"east, west, north, and south."[8]  (Doc. 32-4 at p. 18).  At one time, Supervisor M.P. Palmer's team,[9] which included Mr. Merriweather, worked predominately in the west and south areas.  (Doc. 32-4 at p. 18).  The decision to work in those areas was made by Mr. Palmer and the other supervisors, and Mr. Palmer preferred to work in the south and west areas because they were close to his home.  (Doc. 32-4 at pp. 18-19). That arrangement and the division of Montgomery into areas "didn't last long" and is no longer Charter's practice.  (Doc. 32-4 at p. 19).  Even while the areas system was in place, the teams worked in all areas, as needed.  (Doc. 32-4 at pp. 18-19).

Mr. Merriweather complained to his supervisors, Mr. Palmer and Mr. Lamar Lattimore, about his perception that only whites were assigned to east Montgomery and only blacks were assigned to south and west Montgomery.  (Doc. 32-1 at p. 29). Mr. Merriweather was afraid to report his complaints about work assignments to

---

[8] Defendants contend that Plaintiff's arguments about being forced to work in geographically specific areas are due to be summarily disregarded because Plaintiff does not explain or define those areas.  That position is contrary to the testimony of Mr. Palmer, who explained that he and the other supervisors determined a north, south, east, and west "area" of Montgomery and agreed to divide work assignments among themselves.  The locations of north, south, east, and west Montgomery are derived from Mr. Palmer's testimony on the subject.  Because of Mr. Palmer's testimony, an exact map and demarcation lines are not necessary to resolve Mr. Merriweather's geography related claims on summary judgment.

[9] According to Mr. Palmer, Mr. Merriweather was a dedicated, dependable, and trustworthy employee.  (Doc. 32-4 at p. 23).  Mr. Palmer testified that Mr. Merriweather never complained to him about racial discrimination.  (Doc. 32-4 at pp. 22, 27).  Again, the latter testimony conflicts with Mr. Merriweather's testimony that he did, in fact, complain to Mr. Palmer about certain instances of race discrimination at Charter.  To the extent that Mr. Merriweather's complaints to Mr. Palmer are material, those are expressly discussed *infra*.

human resources because "... if you were known as a whistleblower you wouldn't be there long." (Doc. 32-1 at p. 29). Despite his concerns, he complained to Ms. Johnston. (Doc. 32-1 at p. 29).

In contrast to his assertions that only black BBT's worked the south area of Montgomery, Mr. Merriweather testified that the white BBT's on Mr. Palmer's team also worked in that area. (Doc. 32-1 at p. 29). Mr. Merriweather worked in east Montgomery on occasion, but "very rarely." (Doc. 32-1 at pp. 33, 48).

It is material to this case that the homes in the south and west areas are older, that they require more work than newer homes, it takes longer to work on older homes than newer homes, and older homes present a more dangerous work environment.[10] Mr. Palmer's crew, at least for a period of time, worked primarily on those homes.

At his deposition, Mr. Merriweather identified two Charter employees who he believed discriminated against him because of his race. Mr. Eric Christian, one of Charter's employees who Mr. Merriweather identifies as someone who discriminated against him, told racist jokes or made racially charged remarks. (Doc. 32-1 at p. 34).

---

[10] There is evidence that the time it took to complete work in older homes was similar to the time BBT's spent working in newer homes. (Doc. 32-4 at p. 19). The newer homes, while being mostly pre-wired for cable and having underground utilities, usually needed more outlets installed in the homes and the customers generally purchased more services. (Doc. 32-4 at p. 19). That evidence will not be considered on summary judgment.

The only one of those remarks Mr. Merriweather could remember happened at a company potluck lunch at Charter's office.  According to Mr. Merriweather, Mr. Christian told him that, "I guess you didn't enjoy [your meal] because there wasn't any chicken or watermelon there."   (Doc. 32-1 at p. 34).   Every time Mr. Merriweather was in Mr. Christian's presence, Mr. Christian made a racist joke.  (Doc. 32-1 at p. 34).  Mr. Long did not complain to anyone at Charter about Mr. Christian making racial comments or jokes.  (Doc. 32-1 at p. 34).  Mr. Christian was not a member of management nor was he Mr. Merriweather's supervisor.  (Doc. 32-1 at p. 34).  Mr. Mercer, the successful applicant to the CLI Technician position, also made a racially derogatory comment to Mr. Merriweather on one occasion.  (Doc. 32-1 at p. 34).  Mr. Long did not report this comment to anyone at Charter.  (Doc. 32-1 at p. 25).

Mr. Merriweather testified that there were four black employees who complained to Ms. Johnston about mistreatment and who were fired because of their complaints.  (Doc. 32-1 at pp. 35-36).  He knew of those instances because black employees within Charter talked to one another — "[b]lacks stayed with the blacks and whites stayed with the whites ... [t]hat's how it was at Charter."  (Doc. 32-1 at p. 36).  Charter did not mandate that arrangement; "it's just how it was ...."  (Doc. 32-1 at p. 36). Charter took steps to correct any actual or perceived segregation of which

it was aware and has a written policy prohibiting race discrimination.

Mr. Merriweather and other Charter employees were required to attend a weekly departmental meeting every Wednesday.  They gathered in a large room furnished with chairs and tables.  There is contradictory evidence on this point, but for the purposes of summary judgment and drawing a reasonable inference from the evidence in Mr. Merriweather's favor, the white employees sat at tables together on one side of the room while the black employees sat at tables on the other side of the room.  That said, there is no evidence of record that Charter required, suggested, or condoned that seating arrangement.  In 2009, Ms. Johnston noticed that employees were congregating at the Wednesday meetings based on race and she communicated her observation to Mr. Ed Keeley, a member of management in Montgomery.  (Doc. 32-6 at p. 11).  To address the issue, Mr. Keeley required employees to sit at tables with their supervisors.  (Doc. 32-6 at pp. 11-12).  It is undisputed that each supervisor's team included both white and black employees.

In 2010, Mr. Merriweather sustained a job related injury that required medical care.  He was assigned to light duty work for several months in 2010 and 2011.  (Doc. 32-3 at p. 6).  Depending on Charter's business needs, employees on light duty are tasked with jobs that are within the restrictions on duty mandated by the employees' doctors.  (Doc. 32-2 at p. 28).  The tasks include cleaning used cable boxes, cleaning

used remote controls, and calling customers. (Doc. 32-2 at p. 28). If there are no tasks suitable to light duty or if the available tasks do not comply with an employee's medical restrictions, the light duty employee is sent home. (Doc. 32-2 at p. 28). Charter did not view Mr. Merriweather's injury as a "negative performance issue." (Doc. 32-3 at p. 6). Mr. Merriweather was on medical related leave between September 6, 2010 - February 8, 2011 and between April 8, 2011 - August 15, 2011. (Doc. 32-3 at p. 7).

It is undisputed that, while on light duty, Mr. Merriweather and another black employee were required to fabricate "cable ties," presumably to be used in the cable installation or maintenance process. (Doc. 25 at p. 17, Defendant's Brief in Support of Summary Judgment). A white employee who was on light duty also made cable ties, he was not as productive as Mr. Merriweather, and he was permitted to watch television in a room with a window while he worked. Mr. Merriweather and the other black employee were in separate, windowless, private rooms, and they did not have access to a television. Mr. Merriweather recalls that the same white employee, while he was on light duty, was permitted to ride around in a truck during the day in the company of other employees. Charter does not have a rule forbidding light duty employees from riding along with other employees in trucks. (Doc. 32-4 at p. 27). While on light duty, Mr. Merriweather also rode in a truck with a trainee employee

14

and instructed him on proper techniques.  (Doc. 32-4 at p. 27).

In support of his race claims, Mr. Merriweather identifies an instance when he was not allowed to use accumulated vacation leave to attend a professional wrestling event in Birmingham, Alabama, with his young son.  It is undisputed that, pursuant to Charter's policy, an employee seeking to use vacation leave must ask his or her supervisor two weeks in advance of the requested vacation dates unless otherwise instructed by the supervisor.  (Doc. 32-3 at p. 5).  Mr. Merriweather complied with Charter's policy, but his leave request was denied.  Mr. Merriweather identifies a group of white employees who were granted vacation leave, despite not requesting the leave within the two week margin, so that they could attend a concert.

On Sunday, August 28, 2011, Mr. Merriweather submitted a letter of resignation to his supervisor, Mr. Palmer.  Mr. Merriweather contemplated suicide before he decided to resign, and he sought medical attention.  (Doc. 32-1 at p. 24). He told his doctor that he was considering taking his own life because he thought he had been denied promotions based on his race.  (Doc. 32-1 at p. 24).  Mr. Merriweather did not take the medication prescribed by his physician and he did not follow up with a psychologist.  (Doc. 32-1 at p. 24).  His suicidal thoughts passed after two days, during which he spent time with his wife and played with his son. (Doc. 32-1 at p. 24).  His thoughts of suicide have not returned.  (Doc. 32-1 at p. 24).

Mr. Merriweather, during or at the end of a work shift, slid his letter of resignation under Mr. Palmer's office door on Sunday, August 28, 2011. (Doc. 25-1 at pp. 21-22). Mr. Palmer was not in his office that day. The date on the letter is Monday, August 29, 2011, which Mr. Merriweather used because that was the date that he expected Mr. Palmer would receive and read the letter. (Doc. 25-1 at pp. 21-22). Mr. Merriweather did not intend for his resignation to have immediate effect; rather, he planned to work for a "couple of weeks" after giving notice of his resignation. (Doc. 25-1 at pp. 19-20). Charter did not schedule Mr. Merriweather to work after he resigned.

The parties argue over the meaning behind Mr. Merriweather's letter of resignation and what he did or did not communicate to Charter in that document. That letter reads, in pertinent part:

> To Whom It May Concern:
>
> I am turning in my letter of resignation from Charter Communications. I am unable to get over the past issues of the company[.] [S]ome of the issues of concern were (a) the company's oversight of furthering my career advancement; (b) the many times I applied for other positions and was turned down with no real reason or explanation as to why I did not get the position; and © the fact that I am having to deal with the physical depression from the on the job issues. I, Courtney Merriweather, will be separating from my employer Charter Communications, due to the stated issues above. If you feel the need to contact me please do so via email ... or by phone .... Thank [you] in advance for your time and attention.

(Doc. 25-1 at p. 46, Ex. 8 to Merriweather Deposition).  Mr. Merriweather, despite being willing to return to his job, did not work during the two week notice period after he submitted the resignation letter, and he is not eligible for rehire at Charter for that reason.  (Doc. 32-4 at p. 9).  Mr. Merriweather testified that he resigned because he was "frustrated" that he was not hired to the four positions he applied for and because he was concerned that he would be fired for voicing his support for unionization efforts to Ms. Johnston in human resources.  (Doc. 32-1 at pp. 24-25). He also resigned because Mr. Mercer passed him in a hallway after Mercer was awarded the CLI Technician job and said, "if you was white it would have been alright."  (Doc. 32-1 at p. 25).

Mr. Merriweather testified that "(a)" and "(b)" were related to the positions he applied for but to which he did not get hired or promoted.  (Doc. 32-1 at p. 22).  His letter of resignation does not include any statement about race discrimination because, according to Mr. Merriweather, he did not think he needed to put those allegations in writing after making work related complaints to Ms. Johnston and Mr. Palmer. (Doc. 32-1 at p. 23).

Mr. Merriweather's EEOC charge is dated May 28, 2011.  (Doc. 32-1 at p. 8). He decided to file the charge after he was passed over for the CLI Technician position and after reflecting on the other jobs he unsuccessfully applied for within Charter.

17

(Doc. 32-1 at p. 7).  After meeting the administrative prerequisites for a Title VII lawsuit, Mr. Merriweather filed the instant case.

## III.    SUMMARY JUDGMENT STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000).[11]  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party has met its burden, Rule 56 requires the nonmoving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *Celotex*, 477 U.S. at 324.

---

[11]  In 2007, Rule 56 was amended in conjunction with a general overhaul of the Federal Rules of Civil Procedure. The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*." Adv. Comm. Notes to Fed. R. Civ. P. 56 (2007 Amends.) (emphasis supplied). Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

The substantive law will identify which facts are material and which are irrelevant. *Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023. If the evidence [presented by the nonmoving party to rebut the moving party's evidence] is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See *Fitzpatrick*, 2 F.3d at 1115-17 (citing *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)). If the moving party bears the burden of proof at trial, then it can meet its burden on summary judgment only by presenting positive evidence that demonstrates the absence of a genuine issue of material fact; i.e., facts that would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence

19

demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for a directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of any evidence in the record in support of a judgment for the nonmoving party on the issue in question. This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the court that there is an absence of evidence to support the non-moving party's case. *Fitzpatrick*, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the nonmoving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the nonmoving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged

20

evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *Lewis v. Casey*, 518 U.S. 343 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## IV.   DISCUSSION

### A.   Plaintiff's § 1981 claims

This case involves claims brought under both Title VII and § 1981.  The elements of proof for a § 1981 claim are essentially the same as for a Title VII claim.  *See*, *e.g.*, *Crawford v. Western Electric Co., Inc.*, 614 F.2d 1300, 1315 n.27 (5th Cir. 1980)[12] (describing § 1981 as "a parallel remedy against discrimination which ... derive[s] its legal principles from Title VII") (quoting *Blum v. Gulf Oil Corp.*, 597 F.2d 936 (5th Cir. 1979)).  In other words, because "[b]oth of these statutes have the same requirements of proof and use the same analytical framework ... we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well."  *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998); *see also*, *e.g.*, *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980) ("When section 1981 is used as a parallel basis for relief

---

[12] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

with Title VII against disparate treatment in employment, its elements appear to be identical to those of section 706 [of Title VII, *i.e.*, 42 U.S.C. § 2000e-5].") (citations omitted).

Indeed, the Eleventh Circuit has long recognized that when "a plaintiff predicates liability under Title VII on disparate treatment and also claims liability under sections 1981 and 1983, the legal elements of the claims are identical." *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985). *See also*, *e.g.*, *Brown v. American Honda Motor Co., Inc*., 939 F.2d 946, 949 (11th Cir. 1991) ("Section 1981 requires proof of *intentional* discrimination ... The Supreme Court has held that the test for intentional discrimination in suits under § 1981 is the same as the formulation used in Title VII discriminatory treatment cases.") (citations omitted) (emphasis in original); *Palmer v. District Board of Trustees of St. Petersburg Junior College*, 748 F.2d 595, 596 n.2 (11th Cir. 1984) (same).

Accordingly, this court will "explicitly address [Mr. Merriweather's] Title VII claim[s] with the understanding that the analysis applies to the § 1981 claim[s] as well." *Standard*, 161 F.3d at 1330.

## B.    Plaintiff's Title VII Claims

Proving that an employer relied on a plaintiff's race when terminating his employment is rarely a straightforward undertaking. Stated differently, a plaintiff's

22

case generally rests entirely on circumstantial evidence, because direct evidence of an employer's intent or motivation often is either unavailable or difficult to acquire. *See Sheridan v. E.I. DuPont De Nemours & Co.*, 100 F.3d 1061, 1071 (3rd Cir. 1996) (*en banc*).  Such is the case here as the parties rely on only circumstantial evidence.

Federal courts typically evaluate the sufficiency of circumstantial evidence using some variant of the framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  *See also St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993).  As Justice O'Connor observed in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), "the entire purpose of the *McDonnell Douglas prima facie* case is to compensate for the fact that direct evidence of intentional discrimination is hard to come by." *Id.* at 271 (O'Connor, J., concurring).

Under the *McDonnell Douglas* framework, a plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  *See McDonnell Douglas*, 411 U.S. at 802; *see also Burdine*, 450 U.S. at 253-54 & n.6.  A plaintiff's burden to initially satisfy the elements of a *prima facie* case is not great.  *Burdine*, 450 U.S. at 253 ("The burden of establishing a *prima facie* case ... is not onerous."); *see also*, *e.g.*, *Turlington v. Atlanta Gas Light Co.*, 153 F.3d 1428, 1432 (11th Cir. 1998) ("[A] plaintiff's burden in proving a *prima facie* case is light."); *Holifield v. Reno*, 115 F.3d

1555, 1562 (11th Cir. 1997) (*per curiam*) ("Demonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference [sic] [*give rise to a rebuttable presumption*] of discrimination.") (alteration added).

"The effect of the presumption of discrimination created by establishment of the *prima facie* case is to shift to the employer the burden of producing legitimate, non-discriminatory reasons for the challenged employment action." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 254); *see also*, *e.g.*, *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002) (same).

To rebut the presumption of intentional discrimination, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the [contested employment decision]." *Burdine*, 450 U.S. at 255. If a defendant carries its burden of producing "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus," *id*. at 257, the presumption of discrimination created by the *prima facie* case "drops from the case," and "the factual inquiry proceeds to a new level of specificity." *Id.* at 255 & n.10.

The burden then shifts to the plaintiff to "come forward with evidence,

including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," but merely pretext for intentional discrimination. *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804). *Cf. Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000) (holding in the context of a Rule 50 motion that "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."). If a plaintiff does so, then he or she "is entitled to survive summary judgment." *Combs*, 106 F.3d at 1529. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143.

In keeping with those standards, the court recommends the following disposition of Plaintiff's Title VII and § 1981 race discrimination claims.

## 1.   Discriminatory Termination

A *prima facie* case for discriminatory termination is shown if a plaintiff: (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) was replaced by a person outside his protected

class.  *See Maynard v. Board of Regents of the Divisions of Universities of Florida Department of Education*, 342 F.3d 1281, 1289 (11th Cir. 2003) (citing *McDonnell Douglas*, 411 U.S. at 802).

Plaintiff argues that he was constructively discharged, a point Defendants vehemently oppose.  A constructive discharge is, as a matter of law, an adverse employment action and not a legally cognizable claim.[13]  *See Burden v. International Longshoremen's Association, Local No.1410*, 510 F. Supp. 2d 618, 625 (S.D. Ala. 2007) (explaining that a constructive discharge is often asserted by plaintiffs as an independent claim, but that it is, in fact, an adverse employment action and, thus, is only an element of a broader claim) (citing *Rowell v. BellSouth Corp.*, 433 F.3d 794, 806-07 (11th Cir. 2005).  To prove a constructive discharge, "a plaintiff must demonstrate that working conditions were 'so intolerable that a reasonable person in [his] position would have been compelled to resign.'"  *Griffin v. GTE Florida, Inc.*, 182 F.3d 1279, 1283-84 (11th Cir. 1999) (citing *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997); *Thomas v. Dillard Department Stores, Inc.*, 116 F.3d 1432, 1433-34 (11th Cir. 1997)).  The plaintiff bears the burden of proof to show a constructive discharge.  *See*, *e.g.*, *Kilgore v. Thompson & Brock Management,*

---

[13] Mr. Merriweather sets out a separately numbered claim for "constructive discharge" in his Complaint.  (Doc. 1 at p. 10, ¶¶ 48-50).  That claim is construed as being made in support of Mr. Merriweather's claim of discriminatory termination.

*Inc.*, 93 F.3d 752, 754 (11th Cir. 1996).  A constructive discharge will not lie where an employer was not given an opportunity and sufficient time to remedy the situation. *See id*.

In Title VII cases, an alleged constructive discharge is generally analyzed as follows:

> Under the doctrine of "constructive discharge [...] [t]he general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer ... is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee." *Young v. Southwestern Sav. and Loan Assoc.*, 509 F.2d 140, 144 (5th Cir. 1975).  In assessing constructive discharge claims, we do not consider a plaintiff's subjective feelings about his employer's actions.  Rather, we determine whether "a reasonable person in [the plaintiff's] position would be compelled to resign." *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1317 (11th Cir. 1989); *accord, e.g.*, *Serrano-Cruz v. DFI Puerto Rico, Inc.*, 109 F.3d 23, 26 (1st Cir. 1997) ("We have long applied an 'objective standard'...."); *Kelleher v. Flawn*, 761 F.2d 1079, 1086 (5th Cir. 1985) ("[S]ubjective impressions as to the desirability of one position over another cannot control our decision.") (quoting *Lee v. Russell Cty. Bd. of Educ.*, 563 F.2d 1159, 1162 (5th Cir. 1977)).

*Doe v. DeKalb County School District*, 145 F.3d 1441, 1450 (11th Cir. 1998).  "The standard for proving constructive discharge is higher than the standard for proving a hostile work environment."[14]  *Hipp v. Liberty National Life Insurance Co.*, 252

---

[14] This distinction is not without a practical impact as a plaintiff can produce evidence sufficient to show a hostile work environment but insufficient to give rise to an issue of fact at trial for a constructive discharge. *See, e.g.*, *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1316-18

F.3d 1208, 1231 (11th Cir. 2001); *see also Bryant v. Jones*, 575 F.3d 1281, 1298-99 (11th Cir. 2009) (same).  Ultimately, whether a constructive discharge occurred is a question of fact.  *See Buckley v. Hospital Corporation of America*, 758 F.2d 1525, 1530-31 (11th Cir. 1985) (treating a constructive discharge as a question of fact for the jury to decide).  The pertinent issue on summary judgment is whether a plaintiff has put forth sufficient evidence to show a genuine issue of material fact tending to show intolerable working conditions.  *See Fitz v. Pugmire Lincoln-Mercury, Inc.*, 348 F.3d 974, 978-79 (11th Cir. 2003) (comparing cases in which a court found or rejected a plaintiff's proffered evidence as giving rise to a material dispute of fact on the matter of intolerable working conditions).

Here, as a matter of law and for the reasons discussed *infra*, because Mr. Merriweather has not presented sufficient evidence to show a hostile work environment, his constructive discharge argument fails.  *See Hipp* & *Bryant*, *supra*. That notwithstanding, Mr. Merriweather does not meet the threshold for surviving summary judgment on the issue of constructive discharge.

In support of his constructive discharge argument, Mr. Merriweather claims he resigned because he was not promoted and "because he no longer could endure the

---

(11th Cir. 1989); *Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 905-06 (11th Cir. 1988). The bar at summary judgment for a constructive discharge is within reach, but it is very high.

racial discrimination at Charter." (Doc. 33 at p. 19).  According to Mr. Merriweather, he was depressed and suicidal because of ongoing discrimination against him and he felt compelled to resign because "other employees were picking on him" for not getting promoted.  (Doc. 33 at p. 19).  The only solution, in Merriweather's opinion, was for him to resign.  However, in his resignation letter, he did not state any of the foregoing as reasons for his resignation nor did he verbally communicate those reasons to Charter.  As such, he denied Charter the opportunity to investigate, address and, if necessary, cure the situation.  More importantly, he testified at his deposition that he was willing to work an additional two weeks after his resignation date.  In other words, Merriweather argues both that his work situation was so permeated with race discrimination and ridicule that he was suicidal at the prospect of continuing to work for Charter *and* that the situation was not so intolerable that he was willing to return to work for an additional two weeks after his resignation.  Those assertions are irreconcilable.

By definition, a constructive discharge is akin to a termination in that the employment situation is intolerable to the point that the employee cannot return to his job.  Mr. Merriweather cannot maintain a constructive discharge after testifying, under oath, that he was willing to return to work for two weeks without any change to his work environment whatsoever.

Mr. Merriweather was not terminated through a constructive discharge. He resigned from his employment. As such, he cannot maintain a cause of action for discriminatory termination, and Defendants are entitled to summary judgment on that claim.

### 2. Disparate Treatment Race Discrimination

A *prima facie* case of race discrimination requires proof of four elements: (1) plaintiff is a member of a protected class; (2) "he was subjected to [an] adverse employment action; (3) [defendant] treated similarly situated non-minority employees outside his classification more favorably; and (4) he was qualified to do the job." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). Viewing the evidence in this case in a light most favorable to Mr. Merriweather and construing all reasonable inferences for his benefit, he cannot show a *prima facie* case of disparate treatment race discrimination.

### a. Disparate Treatment — Failure to Promote

The only discriminatory promotion claim at issue in this case involves Mr. Merriweather's denial of the CLI Technician position. On the undisputed evidence of record, Mr. Merriweather is a member of a protected class and, in hiring Mr. Mercer (white) as a CLI Technician instead of Mr. Merriweather, Charter treated a member outside Mr. Merriweather's protected class more favorably. In support of

summary judgment on this claim, Defendants argue only that Mr. Merriweather did not suffer an adverse employment action because the CLI Technician job was not a promotion.  (Doc. 25 at pp. 21-26).  Charter does not make any argument that Mr. Merriweather was not qualified for the CLI Technician position; indeed, there is evidence of record that Mr. Merriweather met the minimum qualifications for the position.

The only disputed element of a *prima facie* case is whether Mr. Merriweather suffered an adverse employment action when he was denied the CLI Technician job. More specifically, the question presented is: Was the CLI Technician position a promotion for Mr. Merriweather?  On the evidence of record, it was not a promotion.

Mr. Merriweather subjectively considered any opportunity to work in different jobs within Charter to be a promotion because he thought the experience would bolster his qualifications for advancement in the future.  However, the determination of whether an employment decision is adverse — in this case, the denial of a promotion — is an objective one, and a plaintiff's subjective perceptions do not play a role.  *See Doe*, 145 F.3d at 1448-49 (holding that courts are not bound to a "subjective standard" when determining whether an employment decision is adverse and that an "objective" standard is appropriate).

A discriminatory promotion claim necessarily requires that the employee be

denied a promotion, not a transfer or a lateral position. *See Doe*, 145 F.3d at 1449-50 (noting that a "lateral transfer ... that does not involve a demotion in form or substance ... cannot rise to the level of a materially adverse employment action ....") (citations omitted). Other than Mr. Merriweather's opinions and perceptions of the position, the evidence is that a CLI Technician is an entry level job from which an employee would be promoted to a BBT position — the job Mr. Merriweather held when he applied to be a CLI Technician. Mr. Merriweather did not occupy an entry level position when he applied to be a CLI Technician; he had been promoted beyond the entry level of employment at Charter. Objectively, the CLI Technician position is, at best, a lateral position to Mr. Merriweather's job as a BBT II. On the evidence of record, had Mr. Merriweather been awarded the job, he could have made a persuasive argument that the transfer was a demotion.

Mr. Merriweather contends that he makes out a *prima facie* case on this element because "there are issues of fact as to whether the job would have been a pay raise, whether the CLI Tech job would allow Merriweather to physically continue working in the company, and whether the job carried more prestige, advancement and learning opportunities." (Doc. 33 at p. 24). On the matter of whether Mr. Merriweather would have realized a pay increase if he moved to the CLI Technician job, he posits that the medium and high pay scale ranges for that position were higher

than those for Mr. Merriweather's BBT II position.[15]   Assuming that to be true, Plaintiff's argument does not address whether Mr. Merriweather actually would have been paid more than he made as a BBT II, and he ignores other undisputed evidence of record specific to the pay rate Mr. Merriweather would have been given had he been offered the job.  The successful applicant was paid less than Mr. Merriweather. Moreover, as discussed above, Charter's Rule 30(b)(6) representative testified that Mr. Merriweather would not have been offered a pay raise had he been the successful candidate.[16]   In fact, he was willing to take a significant pay decrease.   Mr. Merriweather's argument that he would have been paid more as a CLI Technician is speculative.  He predicts the possible contours of events that never took place.  This speculation will not create an issue of fact for trial.

Mr. Merriweather contends that the CLI Technician position would have been a promotion because he would have been able to physically continue working for Charter had he been the successful applicant for that job.  That contention assumes a fact not in evidence — *i.e.*, that Mr. Merriweather could not continue to work at

---

[15] This argument is not supported by the evidence of record which shows, as discussed above, that the high pay rate for a BBT II is greater than the high pay rate for a CLI Technician.

[16] Mr. Merriweather notes that the Rule 30(b)(6) deponent testified that "there were no set policies to determine the amount within the designated range of pay that Merriweather would receive."  (Doc. 33 at p. 24, citing Doc. 32-2 at p. 40).  She testified that Charter would not, as a matter of practice and consistent with "promotional increase guidelines," increase the pay of a lateral transfer without "regional or divisional approval[.]" (Doc. 32-2 at p. 40).

Charter unless he was hired as a CLI Technician. Prior to his resignation, Mr. Merriweather was working as a BBT II, and was seemingly physically able to continue in his position. There is no allegation or evidence in this case that Mr. Merriweather could not continue to physically perform his job duties as a BBT II, and Mr. Merriweather's physical abilities are immaterial to the issue of whether Mr. Merriweather was denied a promotion.

Likewise, there is no evidence, other than Mr. Merriweather's conclusory opinion,[17] that the CLI Technician job was more prestigious or allowed for greater opportunity for advancement than a BBT II position. A CLI Technician was an entry level position from which there was no direct path to promotion, and it has since been eliminated by Charter.

To the extent that Mr. Merriweather would have been able to learn additional skills as a CLI Technician, he does not cite to any legal authority for the proposition that an employee suffers an adverse employment action if he is not offered an entry level job (one below his current status level) that will allow the employee to learn a different set of skills from those the employee uses in his present job position. In this

---

[17] A court is under no obligation to consider a party's conclusory testimony when ruling on summary judgment. *See Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 and n.6 (11th Cir. 1998) (a district court properly struck a conclusory and generalized affidavit when ruling on summary judgment).

case, there is no objective evidence that any skills Mr. Merriweather learned as a CLI Technician would lead to a promotion beyond the BBT II level at some point in the future. Even if there was such evidence of record, the fact that Mr. Merriweather would learn new skills that he might use when applying for future promotions does not cause the CLI Technician job to rise to the level of a promotion.

No adverse employment action arises from Charter's refusal to hire Mr. Merriweather as a CLI Technician because his transfer to that job would not have constituted a promotion. Accordingly, he cannot make out a *prima facie* case of race discrimination for failure to promote.[18] As such, summary judgment is due to be granted in Defendants' favor on that claim.

### b.   Disparate Treatment in Job Assignments

In opposition to summary judgment, Mr. Merriweather asserts that Charter created and maintained a racially segregated workplace by (1) assigning him to predominately work in the south and west areas of Montgomery, which he alleges are predominately populated by black and poor people; and (2) that the assignment to the south and west areas of Montgomery required him to work in older homes that required additional work and are a more dangerous workplace while white employees

---

[18] The court does not address whether Defendants presented a legitimate, non-discriminatory reason for its employment decision and Plaintiff's argument that Defendants' stated reasons are pretext.

worked in east Montgomery in newer homes that necessitated less work. (Doc. 33 at p. 37). In support of his argument that he makes out a *prima facie* case for disparate treatment in job assignments, Mr. Merriweather argues that his work assignments rise to the level of an adverse employment action in light of this court's holding in *Hunter v. Army Fleet Support*, 530 F. Supp. 2d 1291 (M.D. Ala. 2007).

In *Hunter*, the court was presented with evidence that the plaintiffs, who are black, were assigned to work on an entirely "black crew" and white employees worked on a "white crew." 530 F. Supp. 2d at 1293. The crews maintained and cleaned military helicopters, referred to as "birds," that were used for training flight missions *Id.* A helicopter that was flown in a live fire training exercise is called a "dirty bird" because the firing of ammunition discharges gunpowder, which causes the helicopter to require more work to clean it after a flight than a helicopter that did not fire live ammunition during a training flight. *Id.* "Working on dirty birds is dirtier, more strenuous, and more tedious than working on clean birds." *Id.* The plaintiffs alleged that the black crew was assigned a disproportionately higher number of dirty birds than the white crew, and that led to them having to engage in more strenuous labor and to work more hours for the same pay than those on the white crew. *See Hunter*, 530 F. Supp. 2d at 1293-95.

36

When addressing the "adverse employment actions" issue,[19] the *Hunter* court summarized the current state of the law in the Eleventh Circuit:

> Under the governing standard for determining adverse-employment actions, an employee must show "a serious and material change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001). Notably, while the Eleventh Circuit in *Davis* expressed caution about finding a work assignment to be an adverse-employment action, it explicitly does not "suggest that a change in work assignments can never by itself give rise to a Title VII claim; in unusual instances the change may be so substantial and material that it does indeed alter the terms, conditions, or privileges of employment." *Id.* at 1244-45.

*Hunter*, 530 F. Supp. 2d at 1294. The court held that an "unusual circumstances" exception to *Davis*, *supra*, was appropriate because the black crew assigned to work mostly on dirty birds resulted in working the same hours as white employees for less pay, which constitutes a "material change by any standard." *Id.* at 1295.

When viewing the evidence in Mr. Merriweather's favor, this case also presents an "unusual circumstance" — *i.e.*, that working on the older homes in the south and west areas of Montgomery arose to a materially different job for those BBT's. There is evidence, in the form of Mr. Merriweather's deposition testimony, Mr. Palmer's

---

[19] The court found that the adverse employment action element and the disparate treatment element of a *prima facie* case collapsed into a single element under the specific facts of *Hunter*. Those elements remain separate under the facts of this case and will be analyzed respectively.

deposition testimony, and the affidavits of two of Mr. Merriweather's former co-workers, that supervisors' teams were assigned, for a time, to work in either east Montgomery or in south and west Montgomery.  That same evidence, if believed by the trier of fact, shows that working in the homes in the south and west areas of Montgomery took longer, was more dangerous, and was more cumbersome than working on homes in the east area of Montgomery.  Furthermore, evidence of record, if believed by a trier of fact, establishes that BBT's working in east Montgomery finished their tasks faster than BBT's working in south and west Montgomery, and that the east Montgomery BBT's  would return to Charter's main office and relax, while still being paid, until the end of their shifts, but their counterparts in the south and west areas were forced to work harder and longer.  If BBT's worked predominately in south and west Montgomery, they were paid less because they worked longer hours while being compensated under the same pay scale than the east-Montgomery BBT's who worked less time for the same pay.[20]  On that ground, BBT's assigned to work predominately in south and west Montgomery worked a materially different job than those working in east Montgomery.  For purposes of summary judgement, Mr. Merriweather has established that being assigned to work exclusively

---

[20] This conclusion assumes that Charter applied its pay scale uniformly to all BBT's in Montgomery.  There is no evidence to support a contrary assumption.

or mostly in south and west Montgomery constitutes an adverse employment action.

That said, Plaintiff's response brief lacks any argument that a crucial element of a *prima facie* case is satisfied — *i.e.*, that Mr. Merriweather was treated less favorably than a similarly situated individual who are not in his protected class. *See Maynard v. Bd. of Regents of Div. Of Univs. of Fla. Dept of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003); *Hunter*, 530 F. Supp. 2d at 1294. Mr. Merriweather rests his disparate treatment claim on the allegation that black employees were assigned to work in south and west Montgomery while white employees worked east Montgomery. (*e.g.*, Doc. 33 at p. 39). On this evidentiary record, Mr. Merriweather does not meet his burden to produce evidence that *only* black BBT's were assigned to work in south and west Montgomery and that *only* white employees were assigned to work in east Montgomery, which would bring the facts of this case in line with the allegations in *Hunter*.

Unlike *Hunter*, in which there was allegedly a "black crew" and a "white crew," the instant action involves racially integrated teams of employees who are assigned to one of three supervisors. The evidence is that Mr. Palmer's team, to which Mr. Merriweather belonged, was assigned to work on older homes in the south and west areas of Montgomery, as Charter's three supervisors defined those locations. What distinguishes this case from *Hunter* is that Mr. Palmer's team was comprised

39

of both black and white employees.  Assuming that a work assignment to the south and west areas is an adverse employment action, it was applied to white and black BBT's alike.  Therefore, Mr. Merriweather cannot satisfy the necessary element of a *prima facie* case that he was forced to work an assigned area to which white employees were not assigned.

Because Mr. Merriweather failed in his burden to make a *prima facie* case of disparate treatment in work assignments based on geography and working on older houses, Defendants are entitled to summary judgment on that claim.

### c.    Disparate Treatment in Team Assignments

Plaintiff argues that the evidence in this case establishes an issue of fact for trial that "blacks were disproportionally assigned to work on teams supervised by black supervisors and whites were disproportionately assigned to work under the two white supervisors." (Doc. 33 at p. 40).  That is not so.  Plaintiff does not explain where within the rubric of a *prima facie* case of disparate treatment discrimination analysis his argument lies, but that is immaterial as the evidence of this case and the legal authority on which Mr. Merriweather relies do not support his claim that Charter created and maintained teams that are segregated by race.  Mr. Merriweather likens this claim to *Hunter*, *supra*, where the court found that

> An employer's intentional creation and maintenance of racially

segregated crews is just as invidious and offensive to the notions of equality at the heart of Title VII and § 1981 as would be segregated water fountains, one labeled for whites and the other labeled for blacks, or segregated rest rooms, one labeled for whites and one labeled for blacks. Such intentional racial segregation in the workplace, even without loss of tangible benefits, is invidious and offensive because it is inherently demeaning.

*Hunter*, 530 F. Supp. 2d at 1295 (citations omitted).[21]

As discussed above, the material difference between this case and *Hunter* is that, in the latter case, the plaintiffs alleged that they were "assigned to and maintained in ... an all-black crew because of their race." *Id.* The white employees were grouped together in an all-white crew. *Id.* at 1293. When ruling on summary judgment, the court in *Hunter* held that, despite the fact that two crews were segregated by race for a brief time, there were legitimate, non-discriminatory reasons for that exceptional occurrence and that "the plaintiffs have failed to establish that the defendants did, indeed, intentionally maintain or establish racially segregated work crews." *Hunter*, 530 F. Supp. 2d at 1296. Here, there is no evidence that Charter established or maintained a wholly segregated crew for even a short period of time.

In the present case, as discussed *supra* and viewing the facts in a light most favorable to Mr. Merriweather, it is an inescapable conclusion that the team led by

---

[21] Mr. Merriweather quotes this portion of *Hunter* in his brief in opposition to summary judgment. (Doc. 33 at p. 40).

a black supervisor, Mr. Palmer, and the two other teams led by white supervisors were integrated. Relying on testimony from Charter's Rule 30(b)(6) corporate representative, Mr. Merriweather argues that, during the last four years of his employment, 53% of the employees under Mr. Palmer's supervision are black and that 72% of the white employees were assigned to the other two supervisors, who are both white. (Doc. 33 at p. 14). A calculation based on those figures reveals that Mr. Palmer, as one out of a total of three supervisors, supervised 47% of the white employees. The other two teams, therefore, contained 28% of the black employees. Mr. Merriweather's reliance on *Hunter* is misplaced as that case involved allegations of crews that were not even 1% integrated. Such is not the case here. Mr. Merriweather cannot show that Charter discriminated against him by creating and maintaining racially segregated work crews.[22]

### d.  Disparate Treatment of Light Duty Employees

The discernable differences between Mr. Merriweather's assignments while he worked on light duty and the white employee he identifies is that the white employee

---

[22] Mr. Merriweather urges the court to consider, when analyzing this claim, his evidence that black BBT's were assigned to work in the south and west areas of Montgomery, which are allegedly populated by a high percentage of black residents, that black BBT's were generally assigned to work in older homes, that black and white employees did not sit with one another at weekly meetings, that he was not allowed to use vacation leave and white employees were permitted to use their leave under similar circumstances, and that, while on light duty, he and another black employee were treated differently than a white employee. Those instances are immaterial to the issue of whether Charter created and maintained racially segregated work teams.

did not produce as many cable ties as Mr. Merriweather, the white employee was in a workspace with a television while he worked, the white employee could interact with other employees because he was assigned to work in a common area but Mr. Merriweather and another black employee on light duty could not, and the white employee's workspace had a window.[23]  Mr. Merriweather does not explore how the evidence in this case relates to the required elements of a *prima facie* case of disparate treatment of light duty employees.

Moreover, Mr. Merriweather simply does not demonstrate an adverse employment action while on light duty.  He has not identified a negative impact on his employment arising from his period of light duty.  Being deprived of a television and a window does not materially alter the terms and conditions of his employment as there is no evidence that BBT's are entitled to work in a space with a window and a television. Also, Mr. Merriweather does not explain how being permitted to work in a private office instead of a common area is adverse.  He has not shown how Charter treated the white employee who was on light duty more favorably than it treated Mr. Merriweather.  For those reasons, Mr. Merriweather has not made a *prima*

---

[23] To the extent that Mr. Merriweather argues that the white employee was allowed to ride in a truck with other employees and he was not, that assertion is not supported by the record.  There is undisputed evidence that Mr. Merriweather also rode in a truck with another employee on one occasion while he was on light duty.

*facie* case of disparate treatment race discrimination based on light duty assignments and treatment, and Defendants are entitled to summary judgment on that claim.

### 3.    Hostile Work Environment[24]

To prove a *prima facie* case of hostile work environment, plaintiff must establish:  (1) the employee belongs to a class of protected persons; (2) the employee was subjected to unwelcome harassment; (3) the harassment complained of was based upon the employee's race; (4) the harassment was sufficiently severe or pervasive to alter the terms or conditions of employment and created a discriminatorily abusive working environment; and (5) the employer is responsible under a theory of either direct or vicarious liability.  *See Bivins v. Jeffers Vet Supply*, 873 F. Supp. 1500, 1507 (M.D. Ala. 1994) (citing *Henson v. Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1982)). The Eleventh Circuit reiterated that, "in order to establish that a workplace constitutes

---

[24] Mr. Merriweather makes a hostile work environment claim in his complaint, and Defendants moved for summary judgment on that claim.  (Doc. 1; Doc. 25 at p. 38).  Plaintiff does not defend this claim in his opposition to Defendants' motion for summary judgment.  (Doc. 33). That claim is properly treated as having been abandoned.  *See*, *e.g.*, *Chapman v. AI Transport*, 229 F.3d 1012, 1027 (11th Cir. 2000) ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *McMaster v. United States,* 177 F.3d 936, 940-41 (11th Cir. 1999) (a claim may be considered abandoned when the district court is presented with no argument concerning a claim included in the plaintiff's complaint); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser*, *Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned)).  In the alternative, the claim fails on its merits.

a hostile work environment, a plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Butler v. Alabama Department of Transportation*, 536 F.3d 1209, 1214 (11th Cir. 2008) (quoting *Rojas v. Florida*, 285 F.3d 1339, 1344 (11th Cir. 2002)) (internal marks omitted). In the present case, Defendants only make arguments regarding the fourth element, and the claim can be resolved by focusing on that element alone. The evidence does not show that Mr. Merriweather suffered severe or pervasive harassment.

The fourth element of a *prima facie* case contains both an objective and subjective component. *See*, *e.g.*, *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) ("Harassment is severe or pervasive for Title VII purposes *only if* it is *both* subjectively *and* objectively severe [or] pervasive.") (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (*en banc*)) (emphasis supplied). To be actionable, a plaintiff must show not just that he or she subjectively believed the environment to be hostile or abusive, but that a *reasonable person* in the same or a similar position also would perceive it as such. *See, e.g., Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993). When evaluating the objective severity of the harassment, district courts must examine all

of the circumstances, which may include (but is not limited to) such factors as: the frequency of the discriminatory conduct; its severity; whether the conduct was physically threatening or humiliating, or merely an offensive utterance; and, whether the conduct unreasonably interfered with the plaintiff's work performance. *Id*. at 23; *see also*, *e.g.*, *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997). District courts are instructed to "consider the alleged conduct in context and cumulatively," and to "look at the totality of the circumstances" when determining whether the alleged conduct was objectively severe. *Mendoza*, 195 F.3d at 1242.

Assuming, *arguendo*, that Mr. Merriweather demonstrates that his perception of his work environment is subjectively reasonable, he cannot show objective reasonableness on the evidence of record. Mr. Merriweather suffered unwelcome harassment based on his race by two co-workers. The co-workers were not in supervisory roles. Mr. Mercer, on one occasion, made the comment that "if you were white it would have been alright." Mr. Christian, according to Mr. Merriweather, constantly made racially derogatory remarks and jokes including a comment about "watermelon" and "fried chicken." It is undisputed that Mr. Merriweather did not report either instance to management or human resources.

As discussed above, being denied the CLI Technician position was not an act of race discrimination by Charter. The other instances of alleged discrimination —

46

*i.e.*, segregation in terms of job assignment and at office meetings, light duty disparities between Mr. Merriweather and a white employee, being denied vacation leave on one occasion, and alleged constructive discharge termination — are not, in fact, discriminatory or are not supported by the evidence.

Mr. Merriweather was exposed to one co-worker who regularly makes racist jokes and comments, and a separate racially charged comment by another co-worker. While abhorrent, those instances do not rise to the legal significance of "severe and pervasive" such that the material terms of Mr. Merriweather's employment were changed.  *See*, *e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775 778 (1998) (teasing, offhand comments, and isolated incidents are insufficient to show a severe and pervasive environment); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) ("[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII.").

Upon examining the record as a whole, there is not sufficient evidence to support a hostile work environment claim.  For example, Mr. Merriweather testified that, on their own volition, black workers sat together at weekly meetings, spoke with one another about work issues, complained together to human resources, and worked together on certain job assignments.  White employees in Mr. Merriweather's department also worked together on assignments and sat together at the weekly

meetings.  There is no evidence that those instances of self-imposed segregation were mandated by Charter.  To the contrary, Charter took action to prevent segregation when it learned of instances that promoted the practice.  Ms. Johnston and a manager in Montgomery directed employees to sit with their teams at weekly meetings to put an end to employees sitting together based on their race.  Charter requires team members at the BBT level to work alone, and it ended the practice of employees, both black and white, working together on projects they were assigned to complete individually.  Mr. Palmer testified that the division of labor into geographic "areas" was a short-lived experiment that, in practice, failed in part because BBT's were assigned to work in all areas.  White and black BBT's worked in all areas at all times relevant to this lawsuit.  The undisputed evidence of record is that Charter made efforts to end even the appearance of racial segregation.

In this case, Mr. Merriweather cannot satisfy any of the *Harris* factors when viewing the totality of the circumstances.  Defendants are entitled to summary judgment on Mr. Merriweather's hostile work environment claim because he abandoned the claim and, alternatively, it fails on its merits.

## V.    CONCLUSION

Accordingly, for the reasons as stated, it is the **RECOMMENDATION** of the Magistrate Judge that Defendants' motion for summary judgment (Doc. 24) is due to

be **GRANTED**.  Judgment is due to be entered in favor of Defendants on all claims.

Finally, it is **ORDERED** that the parties shall file any objections to this recommendation on or before **December 2, 2014.**  Any objections filed must specifically identify the findings in the Magistrate Judge's recommendation to which the party objects.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *See Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).[25]

**DONE** and **ORDERED** this 18th day of November, 2014.


/s/ Paul W. Greene
United States Magistrate Judge

---

[25] *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); *Bonner*, *supra* (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).