IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| COURTNEY MERRIWEATHER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 2:13-CV-456-WKW |
| ) | [WO] |
| CHARTER COMMUNICATIONS, ) | |
| LLC, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Courtney Merriweather filed suit against Defendants Charter Communications, LLC, Charter Communications Holding Company, LLC, and Charter Communications, Inc.'s (collectively, "Charter") for employment discrimination. Upon referral (Doc. # 41), the Magistrate Judge recommended that Charter's motion for summary judgment be granted. (Doc. # 45.) Mr. Merriweather timely filed an Objection to the Recommendation (Docs. # 46, 49) and Charter replied (Doc. # 50). After careful consideration of the record, the parties' briefs, applicable case law, and the Recommendation, the court finds that Mr. Merriweather's Objection is due to be overruled and the Recommendation adopted.

## I.  STANDARD OF REVIEW

The court reviews *de novo* "those portions of the . . . [R]ecommendation[ ] to which objection is made."  28 U.S.C. § 636(b)(1).

## II.  DISCUSSION

Mr. Merriweather, of African-American heritage, alleges that Charter discriminated against him on the basis of his race by failing to promote him, assigning him less desirable job duties, segregating its workforce, creating a hostile work environment, and ultimately, constructively discharging him.  Charter moved for summary judgment (Doc. # 24), and the Magistrate Judge recommended that Charter's motion be granted and judgment entered in favor of Charter on all claims.  (Doc. # 45, at 48–49.)

Mr. Merriweather contends that the Recommendation should be rejected and Charter's motion for summary judgment denied.  He argues that the Magistrate Judge misapplied the summary judgment standard and improperly applied case law with regard to four of Mr. Merriweather's claims.

### A.  <u>Failure to Promote</u>

Mr. Merriweather's first challenge is to the Recommendation's resolution of his failure-to-promote claim.  The Recommendation found that Mr. Merriweather failed to establish a *prima facie* claim of disparate treatment race discrimination because he could not show that he had suffered an adverse employment action.

Specifically, the Magistrate Judge determined that becoming a CLI Technician would have been a lateral move for Mr. Merriweather, at best. Mr. Merriweather challenges the determination that the CLI Technician position would not constitute a promotion, arguing that genuine disputes of material fact exist as to whether the new assignment would have come with a pay raise, enabled future career advancement, and allowed him to physically continue working for Charter.

As outlined in the Recommendation, a *prima facie* case of disparate treatment race discrimination requires proof of four elements: (1) plaintiff is a member of a protected class; (2) "he was subject to [an] adverse employment action; (3) [defendant] treated similarly situated non-minority employees outside his classification more favorably; and (4) he was qualified to do the job. *Holifield v. Reno*, 115 F. 3d 1555, 1562 (11th Cir. 1997). For purposes of Mr. Merriweather's failure to promote claim, the Recommendation found insufficiency as to element two – whether Mr. Merriweather suffered an adverse employment action. To constitute an adverse employment action, an employer's conduct must be more than subjectively adverse to the plaintiff; "[i]nstead, the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Hart v. U.S. Att'y Gen.* 433 F. App'x 779, 781 (11th Cir. 2011); *Doe v. Dekalb Cnty. Sch. Dist.*, 145 F. 3d 1441, 1448–49 (11th Cir. 1998).

In his Objection, Mr. Merriweather argues that he "established evidence that the CLI Technician job was a more prestigious job and that [Mr. Merriweather] was informed it would be a pay raise and promotion for him if he received the position." (Doc. # 49.)  A review of the record, however, makes clear that Mr. Merriweather provided little more than his own speculation and opinion as to the anticipated benefits of becoming a CLI Technician.[1]

First, Mr. Merriweather argues that transitioning into the new role would possibly have resulted in a pay increase because CLI Technicians could earn anywhere from $10.95 to $16.45, while he was only earning $13.33 as a BBT II ("Broadband Technician II").  This hope for a raise in compensation is objectively unsupported, however, as the record shows that Mr. Merriweather's earning potential as a BBT II was $1.50 higher than that of the CLI Technician, having a pay range of $12.05 to $18.05.  Additionally, the individual hired to fill the CLI Technician vacancy instead of Mr. Merriweather was paid at a rate of $11.50 an hour, almost $2.00 less an hour than he was making as a BBT II.  Lastly, Paige Wilder, Charter's Director of Human Resources, testified that, based on Charter's

---

[1] In his deposition, Mr. Merriweather does assert that a Charter Human Resources Manager, Sue Johnston, told him that the position would "pay more" and be a promotion. (Doc. # 32-1, at 126:21–127:12 & 135:8–14.)  He also, however, confirms that he was told by his CLI Technician interviewer that the position "would have been a lateral move" and that his pay may even be decreased. (Doc. # 32-1, at 51:1–23.)

"promotional increase guidelines," a lateral transition within the company would not trigger a pay increase.[2]  (Doc. # 32-2, at 152.)

Aside from compensation, Mr. Merriweather argues that he considered the CLI Technician position to be a promotion because it was a prestigious role that would diversify his knowledge and experience of Charter, which would enable future advancement.  This argument fails for two reasons.  First, Mr. Merriweather's assertions supporting the CLI Technician position's relative prestige are attenuated at best.  For example, his Objection references the fact that a CLI Technician needed to be someone "with proven self-discipline and dedication to completing tasks."  (Doc. # 49.)  He does not argue, however, that those same skills were not required of BBT IIs.  Similarly, he highlights the fact that Charter was seeking someone with BBT II certification or equivalent work experience to fill the CLI Technician vacancy.  The same certification or work experience was requested of applicants to the BBT II role, however.

Second, Mr. Merriweather was unable to put forth any evidence indicating that his belief in the value of holding various Charter positions stemmed from any actual policy, whether formal or informal.  As the Recommendation highlighted, he did "not cite any legal authority for the proposition that an employee suffers an

---

[2] While Mr. Merriweather was told by his interviewer that the CLI Technician would be a position lateral to the BBT II position, Ms. Wilder testified that a CLI Technician is classified as a N4 (entry-level position), while a BBT II has an N5 classification.  (Doc. # 32-2, at 147:12–149:7.)

5

adverse employment action if he is not offered an entry level job (one below his current status level) that will allow the employee to learn a different set of skills from those the employee uses in his present job position." (Doc. # 45, at 34.) While Mr. Merriweather notes that most members of Charter's management team started in an entry-level position and worked their way up, he fails to mention that he already fits that mold, having started as an entry-level employee in 2001.

Lastly, Mr. Merriweather argues that the CLI Technician position constitutes a promotion because it would have better suited his physical limitations stemming from an earlier on-the-job injury. He contends that the Magistrate Judge erred when determining that "Mr. Merriweather's physical abilities are immaterial to the issue of whether Mr. Merriweather was denied a promotion." (Doc. # 45, at 34.) This challenge also fails for two reasons. First, the Recommendation is correct in its determination that Mr. Merriweather's interest in a less physically demanding job would not materially alter the analysis, so as to transform the CLI Technician position into a promotion. As this court has explained, the "failure to transfer may constitute an adverse employment action if the new position entails an increase in pay, prestige, or responsibility." *Gaddis v. Russell Corp.*, 242 F. Supp. 2d 1123, 1145 (M.D. Ala. 2003). This standard arose in recognition of the fact that the denial of a transfer can constitute an *adverse* employment action if the currently held position is objectively less desirable than the one to which a plaintiff applied.

That scenario is not present here.  In fact, had Mr. Merriweather been transferred involuntarily to the CLI Technician position from the BBT II position by Charter, a good argument exists that he would have suffered a decrease in "pay, prestige or responsibility" sufficient to constitute an adverse employment action.  *See id*.

Second, Mr. Merriweather failed to address the Magistrate Judge's analysis in its entirety.  The Recommendation highlighted that Mr. Merriweather was basing his physical limitations argument on "facts not in evidence – *i.e.*, that Mr. Merriweather could not continue to work at Charter unless he was hired as a CLI Technician."  (Doc. # 45, 33–34.)  The Magistrate Judge noted that prior to his resignation, Mr. Merriweather had come back from leave and "was working as a BBT II, and was seemingly able to continue in his position."  (Doc. # 45, at 34.)  While, Mr. Merriweather is correct when he points out that his "on the job injury caused him to miss work, take medical leave, and relegated him to light duty work tasks," there is nothing in evidence suggesting that Mr. Merriweather failed to return to a fully functioning BBT II after being released by his doctor. (Doc. # 49, at 5.)

**B.     Disparate Job Assignments**

Mr. Merriweather next contends that the Magistrate Judge misinterpreted case law when determining that summary judgment was appropriate on his disproportionate work assignment claims.  Mr. Merriweather claimed that he,

7

along with Charter's other black BBT IIs, were "predominately and disproportionately assigned to work in southern and western Montgomery neighborhoods," while white BBT IIs were given more favorable assignments to eastern Montgomery neighborhoods. (Doc. # 49, at 7.) Mr. Merriweather alleged that the disproportionate work assignments constituted an adverse employment action sufficient to maintain a disparate treatment race discrimination claim because the homes in the southern and western Montgomery neighborhoods were older, requiring additional and more dangerous work.  Specifically, Mr. Merriweather argued that his promotional opportunities, evaluations, and income were adversely affected because he was continually forced to perform longer, more dangerous installations in the poorer areas of Montgomery.

Mr. Merriweather asserts that the Magistrate Judge correctly determined that a disproportionate assignment of work to southern and western Montgomery would constitute an adverse employment action.  He contends, however, that the Magistrate Judge erred when he determined that Mr. Merriweather had "failed to show that he was treated less favorably than similarly situated [white] employees." (Doc. # 49, at 8.)  The Magistrate Judge based this determination on this court's holding in *Hunter v. Army Fleet Support*, 530 F. Supp. 2d 1291 (M.D. Ala. 2007) – the principle case relied upon by Mr. Merriweather.  In *Hunter*, there was evidence that an employer had entirely segregated its employees into two different aircraft-

technician crews, one consisting of all-white technicians and one consisting of all-black technicians. *Id.* at 1293. The employees then showed that the black crew was given disproportionately more difficult assignments.

The Magistrate Judge, however, distinguished Mr. Merriweather's claim from the disproportionate work assignment claim presented in *Hunter* (which survived summary judgment). The Magistrate Judge found that Mr. Merriweather did not "meet his burden to produce evidence that *only* black BBT[ ]s were assigned to work in south and west Montgomery and that *only* white employees were assigned to work in east Montgomery." (Doc. # 45, at 39.) In his Objection, Mr. Merriweather argues that *Hunter* does not require a plaintiff to show that one race was exclusively required to work difficult assignments while a different race was exclusively assigned easier jobs.

Mr. Merriweather presents a good argument as to the proper interpretation of *Hunter*, but fails to overcome the Magistrate Judge's conclusion that Mr. Merriweather was unable to show that black BBT IIs were treated less favorably than white BBT IIs. As the record makes clear, BBT IIs do not perform assignments in groups, rather each BBT II is individually dispatched to various installation and repair sites throughout the day. Daily assignments are dispatched automatically to each BBT II through a system known as Workforce Express. This

automated system is operated and maintained by Charter's workforce management team based in Vestavia Hills, Alabama.[3]

The dispatched assignments of Mr. Merriweather – and all other BBT IIs – were, however, minimally affected by the setting of start locations. All of Charter's BBT IIs are supervised by one of three Technical Operations Supervisors. Each supervisor is responsible for monitoring the performance of a group of BBT IIs.[4] To allow the workforce management team to dispatch geographically efficient assignments to BBT IIs, each of the supervisors provides his BBT IIs with a set start location. M. P. Palmer, Mr. Merriweather's supervisor and Charter's sole black Technical Operations Supervisor, testified that he and another one of the supervisors together decided where to set the start locations. Mr. Palmer chose to have his BBT II's start locations set in the west and south neighborhoods of Montgomery. Regardless of start location, however, Mr. Palmer testified that a BBT II's assignments and route were determined by "where the work was" and the supervisors "still had to go away from having areas, because everyone was still going different places." (Doc. # 32-4, at 68–69.)

Mr. Merriweather argues that it is this setting of start locations that led to racially disparate work assignments. Specifically, he argues that Charter's black

---

[3] Mr. Merriweather did not identify or allege that anyone in Charter's workforce management team discriminated against him.

[4] Mr. Merriweather's supervisor, M. P. Palmer, referred to his group of BBT IIs as his team. (Doc. # 32-4, at 62:1–13.)

10

BBT IIs were disproportionately assigned to be supervised by Mr. Palmer, Charter's sole black Technical Operations Supervisor, and that this disproportionately black team was purposefully assigned the least desirable start locations, leading to the most difficult assignments.  Mr. Merriweather's attenuated argument is insufficient to establish a *prima facie* case of disparate treatment race discrimination.

    First, there is no evidence that Charter assigned BBT IIs to supervisors based on race.  As the Recommendation explained, and as Mr. Merriweather acknowledged, "during the last four years of his employment, 53% of the employees under Mr. Palmer's supervision" were black, while "72% of the white employees were assigned to the other two supervisors."  (Doc. # 45, at 42.)  Using those figures, the Magistrate Judge concluded that "Mr. Palmer, as one out of a total of three supervisors, supervised 47% of the white employees" and that "[t]he other two teams . . . contained 28% of the black employees."  (Doc. # 45, at 42.)  Accordingly, the record shows that 47% of Charter's white BBT IIs received similar start locations to Mr. Merriweather.  Meanwhile, 28% of Charter's black employees were given start locations in the more favorable east and north neighborhoods.

    Second, Mr. Merriweather is unable to offer specifics as to any white BBT IIs work assignments.  Mr. Merriweather relied entirely on his and two other black

11

BBT IIs testimony asserting that they worked more frequently in Montgomery's south and west neighborhoods than their white counterparts. However, Mr. Merriweather admitted that he was not aware of the particular jobs each BBT II was assigned to perform each day, and, as discussed above, 47% of Charter's white BBT IIs were assigned start locations similar to those of Mr. Merriweather.

Accordingly, the record supports the Magistrate Judge's Recommendation that Mr. Merriweather is unable to establish that Charter's black BBT IIs were treated less favorably than their white counterparts.

## C. Disparate Team Assignments

Mr. Merriweather also argues that the Magistrate Judge misinterpreted case law when he recommended that summary judgment was appropriate on Mr. Merriweather's disproportionate team assignment claims. For the reasons discussed above, Mr. Merriweather's challenge to this aspect of the Recommendation is overruled.

## D. Constructive Discharge

Lastly, Mr. Merriweather objects to the recommendation that summary judgment be granted as to his constructive discharge claim. To prove that a plaintiff was constructively discharged, he "must demonstrate that working conditions were 'so intolerable that a reasonable person in [his] position would not have been compelled to resign.'" *Griffin v. GTE Fla. Inc.*, 182 F.3d 1279, 1283–

84 (11th Cir. 1999) (citing *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997)). The Magistrate Judge determined that, because Mr. Merriweather did not "present[ ] sufficient evidence to show a hostile work environment" and testified under oath "that he was willing to return to work for two weeks without any change to his work environment," Mr. Merriweather could not maintain a claim for constructive discharge.

Mr. Merriweather argues that he established evidence that he was denied several promotions due to his race, endured discriminatory team and work assignments, and endured racial remarks from fellow employees. These facts, however, were not ignored by the Magistrate Judge. Taken as true, they fail as a matter of law to rise to a level that would show the existence of a hostile work environment, and the Eleventh Circuit has held that "[t]he standard for proving constructive discharge is higher than the standard for proving a hostile work environment." *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001). Because no reasonable jury could conclude that the incidents complained of rose to a level sufficient to make Mr. Merriweather's working conditions intolerable, this objection is overruled.

### III. CONCLUSION

Based upon an independent and *de novo* review of the Recommendation to which Mr. Merriweather has objected, it is ORDERED as follows:

1. Mr. Merriweather's Objection (Docs. # 46, 49) is OVERRULED;

2. The Recommendation of the Magistrate Judge (Doc. # 45) is ADOPTED;

3. Charter's Motion for Summary Judgment (Doc. # 24) is GRANTED.

A separate judgment will be entered.

DONE this 25th day of February, 2015.

                                           /s/ W. Keith Watkins
                                    CHIEF UNITED STATES DISTRICT JUDGE